## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

THERESA D. GARCIA,

       Plaintiff,

v.                                          Civ. No. 12-00850 MV/LAM

ALBUQUERQUE PUBLIC SCHOOLS, INC.,
and DOES 1 through 30, inclusive,

       Defendants.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on its order entered March 31, 2014 [Doc. 69] granting Albuquerque Public Schools, Inc.'s ("APS") Motion for Summary Judgment [Doc. 52], and denying as moot APS's Motion for Summary Judgment on Damages [Doc. 53]. The March 31, 2014, order indicates that the Court would, at a later date, issue a memorandum opinion more fully detailing the rationale for its decision. This memorandum opinion contains that rationale.

## BACKGROUND

The amended complaint alleges that APS discriminated against Plaintiff in her employment based upon her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended in 1972, retaliated against Plaintiff in violation of Title VII, and subjected Plaintiff to a hostile work environment in violation of Title VII. APS moves for summary judgment on all of Plaintiff's claims. The parties identify the following facts, which are undisputed unless otherwise noted, to satisfy their summary judgment evidentiary burdens.

In August 2007, APS hired Plaintiff for the position of "coordinator" in the APS Charter and Magnet School Department ("charter school office"). [Doc. 52 at 1]. Dr. Theresa

1

Brito-Asenap, director of the charter school office, was Plaintiff's direct supervisor from August 2007 until September 8, 2008.   [*Id.* at 2].

On May 12, 2008, Brito-Asenap provided Plaintiff with a coaching note that detailed Plaintiff's job duties and required Plaintiff to obtain approval before contacting high-level APS employees and board members, apprise Brito-Asenap of requests from outside organizations, and seek approval before attending meetings outside of the workplace.   [*Id.*].   Brito-Asenap informed Plaintiff that she would take corrective action if Plaintiff's performance did not improve.   [*Id.*].

On September 8, 2008, APS hired Mark Tolley as manager of the charter school office. [*Id.*].   Brito-Asenap became Tolley's supervisor and Tolley, in turn, replaced Brito-Asenap as Plaintiff's direct supervisor.   [*Id.*].

On September 12, 2008, Brito-Asenap determined that Plaintiff had failed to comply with the May 12, 2008, coaching note.   [*Id.*].   Brito-Asenap served Plaintiff with a formal corrective action memorandum to address Plaintiff's pattern of acting outside of her authority in violation of the coaching note.   [*Id.*].   In the corrective action memorandum, Brito-Asenap again instructed Plaintiff to comply with the May 12, 2008, coaching note.   [*Id.* at 3].

On November 6, 2008, Plaintiff sent a memorandum to Brito-Asenap's supervisor Diego Gallegos, Assistant Superintendent, in which Plaintiff accused Brito-Asenap of retaliation, harassment, and "differential treatment."   [*Id.*].   Among other things, Plaintiff alleged that Brito-Asenap treated Plaintiff less favorably than her male co-worker Ron Romero, that Brito-Asenap discontinued Plaintiff's privilege of working a flexible schedule after Plaintiff complained about her work environment to APS's administrative office and thereafter required Plaintiff to work until 5:00 p.m. while allowing all other charter school employees to leave at 4:30 p.m., and that Brito-Asenap allowed Romero and Tolley to attend meetings while denying these

privileges to Plaintiff.   [*Id.*].   Plaintiff's November 6, 2008, memorandum did not allege that Tolley engaged in any discrimination, retaliation, or harassment against Plaintiff.   [*Id.*]. Plaintiff's evidence indicates that she complained on several occasions that Brito-Asenap treated Plaintiff less favorably than she treated Romero.   [Doc. 55 at 10].   Despite Plaintiff's repeated complaints about Brito-Asenap's behavior, Plaintiff admitted in her deposition that Brito-Asenap did not treat Plaintiff differently because of Plaintiff's gender.[1]   [Doc. 52 at 3].

On January 20, 2009, Plaintiff sent Tolley an e-mail asking him to "fiercely protect" her against Brito-Asenap's "continued efforts of harassment" and attempts to "undermine [Plaintiff's] standing" in the community.   [*Id.*].   In response, Tolley sent Plaintiff an e-mail indicating that Plaintiff should respect Brito-Asenap because she is the director of the charter school office, reminding Plaintiff that she again had sent out a communication to an outside party before receiving approval to do so from Tolley, and instructing Plaintiff that she must "run everything by [him] before it is shared outside the office" to prevent "future embarrassment."   [*Id.*].

During the spring of 2009, Tolley began to receive complaints from charter school administrators about Plaintiff's conduct during site visits.   [*Id.* at 3-4].   For example, on March 12, 2009, the principal of the charter school La Promesa Early Learning Center wrote a complaint about Plaintiff's "unprofessional, rude, abrasive, and hostile behavior" during a site visit.   [*Id.* at 4].   The letter described an argument in which Plaintiff tried to push past the school's business manager to gain access to personnel files.   [*Id.*].   The letter requested that Plaintiff "not return to our school for any purpose."   [*Id.*].   Around the same time, the principal of The Learning Community Charter School complained about the terseness of Plaintiff's responses to the principal

---

[1]   Plaintiff objects to this and several additional facts asserted by APS in support of its motion for summary judgment.   The Court addresses the merits of Plaintiff's objections in Section I, and includes herein only the facts which it has concluded are admissible.

regarding certain missing documents during a site visit.   [*Id.*].   On April 7, 2009, Tolley received

an e-mail from the principal of Montessori Elementary School requesting that Plaintiff not attend a

site visit.   [*Id.*].   Plaintiff's evidence establishes that all three of these charter schools shared a

business manager who had a poor relationship with APS.   [Doc. 55 at 12].

On May 21, 2009, Tolley served Plaintiff with a corrective action memorandum regarding

the complaints he had received from the charter school principals, Plaintiff's violation of

Brito-Asenap's instruction that Plaintiff not contact outside administrators without prior approval,

and Plaintiff's adversarial tone in charter school reports.   [*Id.*].   The corrective action

memorandum indicated that Plaintiff's behavior during her site visit at Learning Community

conflicted with the APS charter school office's role of offering technical assistance and not being a

punitive authorizer, that Plaintiff's behavior and attitude during the La Promesa site visit did not

"promote[] the mission" of the APS charter school office, "created an adversarial situation," and

caused Montessori Elementary to request that Plaintiff not attend its site visit, and that the requests

from three charter schools that Plaintiff not be present for site visits "hurt[] the efficiency of the

Charter School Office."   [Doc. 52-12].   The corrective action memorandum also indicated that

Plaintiff's contacting of the director of an outside entity without receiving prior approval from

Tolley "caused confusion and caused th[e APS charter school office] to look confused," and

reminded Plaintiff that Brito-Asenap twice had instructed Plaintiff not to contact any person

outside of the APS charter school office in the position of "manager" or above without receiving

prior approval.   [*Id.*].   Finally, the corrective action memorandum indicated that the tone of

Plaintiff's charter school site visit reports was "condescending" and "punitive" and that Tolley

expected Plaintiff's reports to be written in the non-punitive tone that management set for the APS

charter school office.   [*Id.*].   Tolley's main concern regarding Plaintiff's behavior was her

4

persistent "gotcha" attitude with the charter schools, which conflicted with the APS charter school office's goals and led to strained relationships between APS and the charter schools.   [*Id.* at 4-5].

Plaintiff presents evidence indicating that, after the charter schools complained about Plaintiff's behavior, APS nonetheless sent Plaintiff—unaccompanied by Tolley—on over twenty site visits.   [Doc. 55 at 12].   Plaintiff also points to evidence indicating that, in total, Plaintiff led over fifty site visit teams for APS and that only three charter schools complained about Plaintiff. [*Id.*].

Despite Tolley's May 21, 2009, corrective action memorandum, Plaintiff's tone in her written reports did not improve.   [*Id.* at 5].   Tolley thereafter issued a second corrective action memorandum to Plaintiff because Plaintiff "once again went for things that seemed to be kind of arbitrary and gotcha in nature" in her written reports.   [*Id.* at 5; Doc. 52-5 at 182:23-183:19].

On July 16, 2009, Plaintiff complained to APS's acting superintendent, chief of police, and director of the Office of Equal Opportunity Services ("OEO") that Tolley had entered a hallway and yelled, "Goddamn, mother fu**ing bitch."   [Doc. 52 at 5].   Plaintiff was not in the hallway with Tolley when he made these comments but rather was separated from Tolley by a closed door and a partition.   [*Id.*].   Plaintiff was not a party to the conversation Tolley was participating in immediately before he shouted the profane phrase.   [Doc. 55 at 3].   Plaintiff nonetheless testified that she felt that Tolley's comment was a "direct affront" to her and directed at her.   [*Id.*].   Tolley later apologized to Plaintiff for his comments and informed Plaintiff that his comments were not directed towards her.   [Doc. 52 at 5].

On July 17, 2009, Plaintiff reported to the police that Tolley had shouted profane comments while at work the preceding day.   [*Id.*].   Plaintiff also requested protection from Tolley at an upcoming conference.   [*Id.*].   Plaintiff does not dispute that other than his comments

5

on July 16, 2009, which she felt were directed towards her, Tolley has never taken any threatening actions towards her.   [*Id.*].

Tolley was promoted to director of the charter school office in the summer of 2009 but remained Plaintiff's direct supervisor.   [*Id.*].   Brito-Asenap, Gallegos, and the human resources department instructed Tolley to document "everything" regarding Plaintiff's performance problems.   [*Id.* at 6].   Tolley followed these instructions, documented Plaintiff's poor performance and repeated violations of Brito-Asenap's original May 12, 2008, coaching note, and placed this documentation in Plaintiff's personnel file.   [*Id.* at 5; Docs. 52-14 to 52-17].   Between September 2009 and July 2010, Tolley prepared corrective action memoranda highlighting misconduct, including a September 9, 2009, memorandum reprimanding Plaintiff for failing to notify Tolley of meetings outside the office, a December 15, 2009, memorandum reprimanding Plaintiff for preparing inadequate written reports, reprimanding Plaintiff for repeatedly requesting mileage reimbursement after being informed that her mileage could not be reimbursed and for demanding that Tolley provide her with information not directly related to her duties, a March 10, 2010, memorandum reprimanding Plaintiff for communicating with and sending documents to outside administrators without seeking prior approval, and a June 15, 2010, memorandum reprimanding Plaintiff for conducting unassigned tasks without approval.   [Doc. 52 at 5-6].

Tolley testified that Plaintiff's pattern of communicating with outside organizations without seeking approval created confusion and caused the charter school office to look disorganized.   [*Id.*].   Tolley also testified that Plaintiff's repeated violations of Brito-Asenap's and Tolley's directives, delivered "over and over," not to send communications outside of the office without prior approval, rose to the level of insubordination.   [*Id.*].

On December 23, 2009, Plaintiff complained to Tolley, Assistant Superintendent Diego

Gallegos, and Human Resources Director Karen Rudys, that Tolley had been subjecting her to a hostile work environment since October 2008.   [*Id.* at 7].   In January 2010, Plaintiff reported Tolley's behavior to the United States Department of Education's Office of Civil Rights.   [*Id.*].   Plaintiff believed that, when she filed her complaint with the Department of Education, she had filed a complaint with the Equal Employment Opportunity Commission (EEOC).   [Doc. 55-6 at 158:8-159:12].   Plaintiff testified that she notified Rudys and Gallegos that she was going to file a complaint with the EEOC but admits that she does not know whether Rudys or Gallegos received a physical copy of her January 2010 complaint.   [*Id.* at 160:11-21].

Plaintiff testified that the Department of Education transferred her complaint to the EEOC in January 2010, and that she was in contact with an EEOC case worker from January 2010 forward.   [*Id.* at 158:8-159:12].   Plaintiff also testified that she believed that she had an active EEOC case in January 2010, and insists that her January 2010 filing constituted her first EEOC complaint.   [*Id.*].   Plaintiff admits, however, that her January 2010 "case did not become fully activated" until she filed a complaint with the EEOC on July 30, 2010.   [*Id.*; *id.* at 161:11-17].

On March 31, 2010, Plaintiff filed a complaint against Tolley with the OEO.   [Doc. 52 at 7].   On June 18, 2010, the OEO determined that Plaintiff's allegations of discrimination were "unsubstantiated."   [Doc. 55-13].

Three days later, on June 21, 2010, APS placed Plaintiff on administrative leave.   [*Id.*].   Ten days later, on July 1, 2010, an APS disciplinary committee decided to terminate Plaintiff.   [*Id.*].   In making its decision, the committee considered Tolley's corrective action memoranda documenting Plaintiff's performance problems, Brito-Asenap's coaching note and corrective action memorandum, and Plaintiff's responses to Tolley's and Brito-Asenap's memoranda.   [*Id.*].   The committee also considered Plaintiff's documented problems on site visits and repeated

misconduct from 2008 to 2010, including Plaintiff's failure to comply with the scope of her job duties and her failure to seek approval when communicating with parties outside of the charter school office.   [Doc. 52 at 8].   On July 26, 2010, APS Superintendent Winston Brooks upheld the committee's decision to terminate Plaintiff.   [*Id.*].

On July 30, 2010, Plaintiff filed her charge of discrimination with the EEOC through the New Mexico Department of Workforce Solutions, Human Rights Bureau (Charge No. 543-2010-00559).   [Doc. 55 at 11].   On October 26, 2010, the EEOC issued a determination in which it concluded that there was "reasonable cause to believe that the Respondent (Defendant APS) retaliated against Charging Party (Plaintiff Garcia) in violation of section 703(a) of Title VII."   [Doc. 55-13].   The EEOC determination indicates that Plaintiff filed a complaint with the OEO on March 31, 2010, that the OEO determined that Plaintiff's allegations of discrimination were "unsubstantiated" on June 18, 2010, that APS placed Plaintiff on administrative leave on June 21, 2010, and that APS terminated Plaintiff's employment on July 1, 2010.   [*Id.*].   The EEOC determination concludes that, "[b]ased upon this analysis," reasonable causes exists to support a Title VII violation.   [*Id.*].

Plaintiff does not present direct evidence that Tolley's behavior towards her was motivated by her gender but instead relies upon indirect evidence that Tolley treated a co-worker of Plaintiff's, Dr. James Gonzales, more favorably than he treated Plaintiff to support her Title VII claims.   In the spring of 2009, the APS charter school office hired Gonzales for the position of "coordinator," which was the same position as that held by Plaintiff.   [Doc. 52 at 8].   Gonzales, like Plaintiff, was supervised by Tolley.   [*Id.*].

In July 2009, Tolley exercised his authority to designate Plaintiff's and Gonzales' "primary duties" by preparing written lists to clarify their respective job duties.   [*Id.* at 9].   Tolley testified

8

that his lists described Plaintiff as "Coordinator 1" and Gonzales as "Coordinator 2," but that the distinction "[did not] mean anything, except it just differentiate[d] that there [we]re a couple different duties."   [*Id.*].   Specifically, Tolley testified that the positions were "equal" except that Gonzales' duties included evaluating classroom teachers and principals, whereas Plaintiff's list did not include these duties, because, unlike Gonzales, Plaintiff was not a certified teacher or administrator.   [*Id.*].

Plaintiff's evidence establishes that Tolley required Plaintiff to sign in and out of department board meetings and that he did not require Gonzales to do the same.   [Doc. 55 at 11]. Plaintiff also presents evidence that she was not granted any exceptions to rules or requirements of her job whereas Tolley granted Gonzales exceptions.   [*Id.* at 12].

In addition, Plaintiff points to evidence that Gonzales suffered from performance problems.   For example, a co-worker of Plaintiff's and Gonzales', Carl Macaluso, testified that Gonzales was "never working" and that Gonzales worked on personal matters "a lot" and "probably at least half [of the] time" while at work.   [Doc. 55-7 at 25:15-26:2].   Macaluso also testified that Gonzales frequently arrived late to and left early from work.   [*Id.* at 22:5-15].   In addition, Macaluso testified that he personally observed Gonzales print a "very long" personal document to teach his children the alphabet.   [Doc. 52-24 at 15:9-24].   Macaluso informed Tolley that Gonzales had printed this personal document and that the printing had interrupted Macaluso's work, but Tolley responded by stating that he had to make an exception for Gonzales because Gonzales "doesn't really fit here."   [*Id.* at 14:1-18].   Macaluso also testified that he also witnessed Gonzales print pictures of his children while at work.   [*Id.* at 54:6-15].   Another co-worker, Judy Bergs, testified that she never saw Gonzales work on personal matters while at work and that Plaintiff was the only person who complained to Bergs about Gonzales' use of

9

company time for personal matters.   [Doc. 52 at 10].   Tolley did not personally witness Gonzales working on personal matters while at the office.   [Doc. 52-5 at 178:19-180:7].

Macaluso testified that Plaintiff was not difficult to work with, that Plaintiff was always in the office, that Plaintiff was a conscientious worker, and that he never observed Plaintiff work on personal matters at the office.   [Doc. 55 at 8, 9].   Macaluso testified, however, that he did not work directly with Plaintiff, that he had no personal knowledge of the quality of Plaintiff's work, that he did not verify the truth of the facts underlying Tolley's disciplinary memoranda, and that he had no knowledge of the merits of Tolley's reprimands.   [Doc. 57 at 5].

Macaluso testified that he did not respect Tolley as a manager because Tolley treated Plaintiff unfairly and Gonzales favorably, that Tolley spent more time trying to terminate Plaintiff than doing his own job, and that Tolley never tried to "get rid of" Gonzales but instead granted Gonzales leeway.   [Doc. 55 at 8-9].   Macaluso further testified that he did not observe Tolley speak rudely to or behave inappropriately toward Plaintiff, and that he only believed Tolley was trying to "get rid" of Plaintiff because Tolley issued written reprimands to Plaintiff.   [Doc. 57 at 5].

Tolley testified that his only concerns with Gonzales' performance were minor grammatical problems and an incident in which the director of La Promesa complained to Tolley that Gonzales had an "inappropriate" conversation with a female staff member and that Gonzales shared too much personal information with this staff member.   [Doc. 52-5 at 43:11-44:8].   Tolley had a conversation with Gonzales about the La Promesa complaint, and Gonzales corrected the behavior.   [Doc. 52 at 10].   Tolley further testified that Gonzales "understood the chain of command," and Gonzales did not send communications without approval.   [*Id.*].

Although Plaintiff informed Tolley on February 26, 2010, that the principal of Corrales

International School complained about an incident involving Gonzales and a school staff member, when Tolley contacted the principal to discuss Plaintiff's allegations, the principal denied any knowledge of inappropriate conduct by Gonzales.   [*Id.*].   Likewise, although Plaintiff complained that Gonzales solicited a contract at one charter school, when Tolley contacted the school to inquire about Plaintiff's claim, Tolley could not obtain any verification "that this actually happened."   [*Id.*].

## **<u>STANDARD</u>**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."   *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."   *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912

F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).  The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."  *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g*., *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiff charges APS with discrimination, retaliation, and harassment in violation of Title VII.  Title VII requires employers to make personnel decisions without discriminating against employees based on their race, color, religion, sex, or national origin.   *See* 42 U.S.C. § 2000e-2; *see also Martinez v. Barnhart*, No. 05-4170, 2006 WL 1076126, *2 (10th Cir. Apr. 25, 2006). Title VII also contains an anti-retaliation provision that forbids an employer from penalizing an individual because she has "opposed any practice made an unlawful employment practice" by Title VII.   42 U.S.C. § 2000e-3(a).   In addition, Title VII prohibits an employer from subjecting an employee to a hostile work environment.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2005).

APS moves for summary judgment on all of Plaintiff's Title VII claims on the ground that

Plaintiff has not established a prima facie case of discrimination, retaliation, or harassment.   APS also maintains that it is entitled to judgment as a matter of law on Plaintiff's discrimination and retaliation claims because APS had a legitimate reason to terminate Plaintiff and Plaintiff has not offered any proof which establishes that its reason to terminate Plaintiff was a pretext for discrimination or retaliation.   Finally, Defendant contends that it is entitled to summary judgment on Plaintiff's damages claims.   Plaintiff contends that the evidence construed in her favor satisfies her burdens under the *McDonnell Douglas* framework and that she also has presented evidence that raises a factual dispute which precludes summary judgment under a mixed-motives framework.   The Court first addresses Plaintiff's objections to evidence upon which APS relies in support of its motion for summary judgment, then addresses APS's arguments on the merits of its motion for summary judgment, and last considers whether APS is entitled to summary judgment on the question of damages.

I.      Plaintiff's Objections to APS's Summary Judgment Evidence.

Plaintiff objects to several pieces of APS's summary judgment evidence on the grounds that the evidence constitutes inadmissible character evidence, the evidence is not relevant, the evidence constitutes inadmissible hearsay, the evidence is "compound," and the evidence misstates testimony.   The Court addresses only Plaintiff's objections to facts which the Court considers on summary judgment.   All remaining objections to evidence upon which the Court does not rely are moot and therefore the Court overrules those objections as moot.

Plaintiff contends that APS's undisputed material facts numbered at paragraphs 17 to 20, 23 to 24, 26, 29 to 31, 37, 39, and 45 contain inadmissible character evidence.   Federal Rule of Evidence 404(a) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character

13

or trait." Fed. R. Evid. 404(a).   APS, however, does not proffer the evidence in the aforementioned paragraphs to prove that Plaintiff acted in conformity with any character trait or evidence regarding her character.   Rather, APS offers the evidence to establish, primarily, the reasonableness of Tolley's and/or APS's beliefs regarding Plaintiff's performance.   Moreover, some of the evidence to which Plaintiff objects is not character evidence or evidence of Plaintiff's character traits, but rather simply evidence of Plaintiff's conduct.   Thus, the evidence does not violate Rule 404 and the Court therefore overrules Plaintiff's objections.

Plaintiff objects to APS's undisputed material facts set forth in paragraphs 17 to 20, 23 to 24, 29 to 31, and 39 on the ground that the facts are not relevant.   These facts, however, are relevant to APS's beliefs regarding the quality of Plaintiff's performance and whether Tolley's and/or APS's basis for their adverse employment actions was a pretext for discrimination. Likewise, although Plaintiff contends that APS's undisputed material facts in paragraphs 26 and 37 are not relevant, the Court holds that paragraph 26 is relevant to Tolley's discriminatory intent and to Plaintiff's work environment, and paragraph 37 is relevant to whether Plaintiff engaged in protected activity under Title VII.   For these reasons, the Court overrules Plaintiff's objections on the ground of relevance.

Plaintiff contends that APS's undisputed material facts set forth in paragraphs 18 to 20 contain inadmissible hearsay evidence.   Hearsay is defined as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."   Fed. R. Evid. 801(c).   A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."   Fed. R. Civ. P. Rule 801(a).   The Court concludes that the written complaints from school principals do not constitute hearsay because APS does not offer them to prove the truth of the matters stated therein (*e.g.*, that Plaintiff was in fact "rude" or "abrasive" or

14

that Plaintiff did in fact handle documents as the principal alleged) but rather for the purpose of establishing the basis of Tolley's and APS's beliefs regarding Plaintiff's misconduct and for the purpose of establishing that APS received notice that the principals had complained (*e.g.*, that Plaintiff had, in fact, received complaints from schools).   Thus, the Court overrules Plaintiff's hearsay objections.

Plaintiff objects to several of APS's facts on the ground that they are "compound." Plaintiff fails to cite any authority holding that "compound" evidence on summary judgment is not admissible.   Thus, the Court overrules these objections to "compound" evidence.

Plaintiff last objects to several of the facts identified by APS on the ground that the facts misstate testimony.   The Court has reviewed the testimony itself and, where the testimony itself is inconsistent, the Court has construed the testimony in Plaintiff's favor.   Moreover, the Court has itself reviewed the testimony upon which it relies to reach its summary judgment decision does not rely upon APS's representations of the content of the underlying testimony.   Because the Court has drawn the facts from the underlying evidence itself, and not from APS's characterizations of that evidence, Plaintiff's objections are moot and therefore overruled as moot.

II.   <u>APS is Entitled to Summary Judgment on Plaintiff's Title VII Discrimination and Retaliation Claims</u>.

A plaintiff may show intentional discrimination or retaliation in violation of Title VII through direct or indirect evidence.   If, as here, no direct evidence exists, a court may apply the *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has set forth sufficient indirect evidence of discrimination or retaliation to support a Title VII claim.   *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).   Under *McDonnell Douglas*, if a plaintiff establishes a prima facie case of discrimination or retaliation, the burden then shifts to

15

the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment decision. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citation omitted). If the defendant meets its burden of production by offering a legitimate rationale in support of its decision, the burden shifts back again to the plaintiff to show there is a genuine issue of material fact as to whether the proffered reason is pretextual. *See id.* (citation omitted).

APS moves for summary judgment on Plaintiff's Title VII discrimination and retaliation claims arising out of Brito-Asenap's conduct on the ground that these claims are barred because Plaintiff failed to exhaust her administrative remedies against Brito-Asenap before the EEOC and because Plaintiff failed to raise those claims in her complaint before this Court. APS moves for summary judgment on Plaintiff's discrimination and retaliation claims arising out of Tolley's conduct on the grounds that Plaintiff has failed to satisfy her initial *McDonnell Douglas* burden of establishing a prima facie case of discrimination and retaliation and on the ground that Plaintiff has failed to satisfy her ultimate *McDonnell Douglas* burden of establishing that APS's proffered reason for terminating her was a pretext for discrimination and harassment. Plaintiff maintains that she has satisfied her burdens under *McDonnell Douglas*, and that, in the alternative, she has presented evidence that raises a factual dispute sufficient to withstand summary judgment under a mixed-motives framework. The Court considers the parties' contentions in turn.

A.   Plaintiff is Precluded from Bringing a Title VII Claim Against APS Premised Upon Brito-Asenap's Conduct.

In her response to APS's motion for summary judgment, Plaintiff argues that Brito-Asenap discriminated and retaliated against her, as well as subjected her to a hostile work environment, in violation of Title VII by treating Plaintiff's male co-worker, Ron Romero, more favorably than Plaintiff. Among other things, Plaintiff maintains that Brito-Asenap provided Plaintiff with

16

fewer resources than Romero, refused to allow Plaintiff to attend training and other opportunities while granting these privileges to Romero, and denying Plaintiff a flexible work schedule while allowing Romero to benefit from a flexible schedule.   [Doc. 55 at 15].   APS argues that any claims premised upon differential treatment by Brito-Asenap are barred as a matter of law because Plaintiff failed to exhaust her administrative remedies against Brito-Asenap before the EEOC and because Plaintiff failed to raise these claims in her complaint before this Court.

A plaintiff must administratively exhaust her Title VII claim before bringing the claim in federal court.   *See Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). "Exhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII." *Id*.   An EEOC charge "must contain facts concerning the discriminatory and retaliatory actions underlying each claim[, because] each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted."   *Jones v. UPS*, 502 F.3d 1176, 1186 (10th Cir. 2007).

Exhaustion of administrative remedies is a threshold requirement to bringing suit, and without it, the Court lacks subject matter jurisdiction over the claim.   Plaintiff's EEOC charge does not contain any facts regarding alleged discriminatory or retaliatory actions by Brito-Asenap but instead contains only allegations concerning discriminatory, retaliatory, and harassing conduct by Tolley.   Plaintiff was required to exhaust each discrete incident of alleged unlawful conduct. *Cf. Jones*, 502 F.3d at 1186.   Therefore, to preserve any Title VII claims against APS premised upon the actions of Brito-Asenap, Plaintiff was required to file an EEOC charge identifying Brito-Asenap's alleged unlawful conduct.   Because Plaintiff failed to exhaust her administrative remedies against APS for claims premised upon Brito-Asenap's conduct, and because the time frame during which she could exhaust those remedies has expired, *see Montes v. Vail Clinic, Inc.*,

497 F.3d 1160, 1163 (10th Cir. 2007), the Court lacks subject matter jurisdiction over any Title VII claims premised upon Brito-Asenap's conduct.   Accordingly, the Court grants APS's motion for summary judgment on Plaintiff's Title VII claims to the extent those claims are based upon adverse employment actions allegedly taken by Brito-Asenap.[2]

---

[2] Because the Court grants APS's motion for summary judgment on this ground and this holding is dispositive, the Court declines to consider APS's additional argument that Plaintiff's claims premised upon adverse employment actions by Brito-Asenap are barred because they are not alleged in the complaint.

B.    Plaintiff has not Identified Proof that Satisfies her Summary Judgment Burden of Establishing a Prima Facie Case of Discrimination.

To survive summary judgment under *McDonnell Douglas*, a plaintiff must identify facts that establish a prima facie case of discrimination by showing that (1) she is a member of a protected class, (2) an adverse employment action occurred, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *See Luster v. Vilsak*, 667 F.3d 1089, 1095 (10th Cir. 2011).   APS argues that it is entitled to summary judgment because Plaintiff has failed to satisfy her *McDonnell Douglas* burden of pointing to evidence that establishes the third element of a prima facie case, namely, that the adverse action occurred under circumstances giving rise to an inference of discrimination.   Plaintiff contends that her evidence shows that Tolley treated her less favorably than James Gonzales, a similarly-situated male co-worker, and that this evidence gives rise to an inference of discrimination based upon Plaintiff's gender.

Courts have held that a plaintiff can satisfy the third element of a prima facie case of discrimination by presenting evidence that "the employer treated similarly situated employees more favorably."  *Id.*   The comparable employee must be similarly situated "in all relevant respects."  *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).   Similarly-situated employees are "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997).   In examining this question, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees."  *Id.*  Moreover, "even employees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant."  *McGowan*, 472 F.3d at 745 (internal citation omitted).

The Court is not persuaded that Plaintiff's evidence of differential treatment is sufficient to give rise to an inference of discrimination based upon Plaintiff's sex because Plaintiff's and Gonzales' conduct was not of "comparable seriousness."   Thus, any differential treatment that Plaintiff may have received is not relevant and therefore is not probative of discriminatory intent. *Cf. id.*

Plaintiff argues that Gonzales violated APS's own standards of conduct by "taking unreported time off (akin to wage theft by an employee), working on personal matters at work" more than half of the time, "using company property and equipment for personal use, and arriving late and leaving early from work," and that Gonzales had "an inappropriate discussion with a female co-worker" at La Promesa charter school during which Gonzales over-shared personal information.[3]   Plaintiff also argues that the principal of Corrales International School complained about Gonzales' conduct toward a school staff member and that Gonzales improperly solicited a contract at another charter school.   In addition, the evidence establishes that Gonzales's written reports contained minor grammatical mistakes.

The Court holds that Plaintiff's misconduct was not comparable to Gonzales' misconduct for several reasons.   First, Gonzales' misconduct did not rise to the level of insubordination whereas Plaintiff persistently violated her supervisors' directive not to contact outside administrators or entities without prior approval, despite receiving once coaching note and five corrective action memoranda reprimanding her for failing to seek prior approval.   Brito-Asenap issued a coaching note to Plaintiff in May 2008 instructing Plaintiff not to act outside of her

---

[3]   Although APS points to evidence which suggests that Gonzales used company time and resources for personal gain on only two occasions, and not, as Plaintiff's evidence suggests, more than half of the time, the Court is obliged to construe the facts in Plaintiff's favor.   Thus, the Court assumes that Gonzales engaged in the misconduct Plaintiff identifies persistently.

authority or exceed the scope of her duties and always to seek approval before contacting high-level APS employees and board members.   Plaintiff remained non-compliant and Brito-Asenap therefore in September 2008 issued a formal corrective action memorandum to Plaintiff regarding Plaintiff's pattern of acting outside of her authority and Plaintiff's failure to comply with the May 2008 coaching note.   Then, in May 2009, September 2009, March 2010, and June 2010, after Plaintiff continued to violate Brito-Asenap's directive, Tolley issued four corrective action memoranda reprimanding Plaintiff for her continued pattern of violating her supervisors' directives.

In contrast, the evidence establishes that Gonzales "understood the chain of command" and that he did not engage in insubordinate conduct by violating even once a directive of his supervisors.   For example, after Tolley discussed Gonzales' conduct on a site visit of sharing too much personal information with a La Promesa school staff member, Tolley did not need to correct the behavior again.   Likewise, even if Plaintiff's evidence suggests that Gonzales improperly solicited a contract at a charter school and received a complaint from the principal of another charter school, there is no evidence that Gonzales repeated the conduct on more than one occasion. For these reasons, Gonzales' conduct falls short of Plaintiff's insubordinate conduct of violating, for over two years, a directive repeatedly given, in six formal disciplinary reprimands, by a supervisor.

In addition, the evidence does not establish that Tolley was aware that Gonzales engaged in misconduct.   Thus, for this reason as well the Court holds that Plaintiff was not similarly situated to Gonzales.   Although Plaintiff's evidence suggests that Gonzales repeatedly performed personal work on company time and used company equipment for personal use, that Gonzales arrived at work late and left early, and that Gonzales took unreported time off from work, with the

exception of one occasion on which Macaluso informed Tolley that Gonzales had printed personal materials while at work, the evidence does not establish that Tolley was aware of this misconduct. In addition, even if Plaintiff's evidence suggests that Gonzales improperly solicited a contract at one charter school or that another charter school principal complained about Gonzales' conduct with a charter school employee, Tolley investigated Plaintiff's allegations and could obtain no confirmation that Gonzales engaged in any misconduct.   The Tenth Circuit has held that conduct is not of comparable seriousness if a supervisor is not aware that a co-worker engaged in the conduct.   *Cf. Hysten v. Burlington N. Santa Fe Ry. Co*., No. 09-3333, 2001 WL 892732, *10 (10th Cir. Mar. 16, 2011) (explaining that the plaintiff had failed to establish that his co-workers, who he argued were similarly situated, engaged in conduct of comparable seriousness because, among other things, the plaintiff failed to present evidence that the supervisor was aware that the co-workers engaged in the conduct); *Smith v. Potter*, No. 07-3031, 2007 WL 3104601, *3 (10th Cir. Oct. 24, 2007) (holding that the plaintiff's evidence did not demonstrate how his co-workers were similarly situated to him because the plaintiff "did not show that the Caucasian employees violated the same work rule against leaving the work area without permission, [or] that the Caucasian employees' supervisors knew that they had left their work areas").   Thus, Gonzales' misconduct is not comparable to Plaintiff's for this reason as well.

The Court also concludes that Plaintiff's and Gonzales' misconduct was not comparable because Plaintiff's misconduct had a real-world *inter*-office negative impact on the APS charter school office's relationships with third parties whereas Gonzales' conduct raised only *intra*-office productivity-related concerns.   For example, the evidence establishes that Plaintiff's punitive attitude during her site visits created strained relationships with the charter schools, impeded the ability of the charter school office to accomplish its mission with the charter schools, and resulted

22

in three charter schools banning Plaintiff from their premises.   This ban limited the efficiency of the charter school office and prevented Plaintiff from doing her job.   In addition, Plaintiff adopted a punitive tone and "gotcha" attitude in written reports and this aggressive approach, as well as her punitive attitude during site visits, created tension between APS's charter school office and the schools themselves, limited the ability of the APS office to offer non-adversarial technical assistance to the charter schools, and promoted a negative image of the APS office as punitive authorizer, which was at odds with the tone the office's director intended to set.   Finally, the evidence establishes that Plaintiff's communications to outside parties without prior approval made the APS office look disorganized to third parties, created confusion between APS and outside entities, and embarrassed the office before outside administrators and organizations.

In contrast, Gonzales' conduct did not negatively impact the APS charter school office's relationships with the charter schools or with other outside parties.   Tolley testified that Gonzales did not share Plaintiff's persistent "tone and attitude" problems.   In addition, Gonzales' conduct did not create strained relationships with charter schools, conflict with or impede the image the charter school office wished to promote, embarrass the charter school office, or make the APS charter school office look disorganized and confused to third parties.   Moreover, Gonzales was never banned from a charter school and therefore his conduct did not inhibit the efficiency of the charter school office or its ability to serve its mission.   Finally, Gonzales' written reports contained only minor grammatical mistakes and did not contain punitive remarks akin to those in Plaintiff's reports that strained APS's relationships with third parties, set an adversarial tone, and impeded the mission of the charter school office.   Thus, the Court concludes that Plaintiff and Gonzales did not engage in comparable conduct.

Moreover, although Plaintiff argues that Gonzales engaged in the misconduct of arriving to

work late and leaving early, taking unreported leave from work, and using work time and equipment for personal matters, this misconduct was not similar to Plaintiff's misconduct. Gonzales' *intra*-office productivity-related misconduct did not create *inter*-office tension, impact the charter school office's ability to accomplish its mission, or embarrass the charter school office in front of third parties.   Thus, Gonzales' misconduct was not comparable to Plaintiff's.   *Cf. EEOC v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007) (holding that the plaintiff, who was disciplined for chronic tardiness and unavailability during the workday, which forced other employees to undertake her job duties, was not similarly situated to a co-worker, who also arrived late, called the plaintiff a "bitch," and drank beer at the workplace, because the plaintiff's conduct raised "productivity-related concerns," whereas there was "no evidence that [the coworker's] tardiness prevented him or others from completing their duties").

That Plaintiff presents evidence that she, unlike Gonzales, did not engage in conduct that gave rise to productivity-related concerns, only confirms that Plaintiff's conduct was not comparable to Gonzales'.   Macaluso testified, for example, that Plaintiff was always in the office, that Plaintiff was a conscientious worker, and that he never observed Plaintiff work on personal matters at the office.   Plaintiff's evidence also establishes that Tolley felt he had to grant an exception to Gonzales for Gonzales' use of the office's printer for personal use, but that Tolley gave Plaintiff no similar exception.   This differential treatment, however, is not probative of discriminatory intent because the conduct for which Plaintiff was terminated was not her use of the office's printer for personal use.   Indeed, there is no evidence that Plaintiff requested or required any exception to engage in the conduct Gonzales engaged in—or in any other conduct comparable to Gonzales'—or that Tolley denied Plaintiff an exception to which he granted Gonzales.   Thus, Plaintiff's evidence that she did not engage in productivity-related conduct and did not receive an

exception to engage in such conduct does not give rise to an inference of discrimination.

To raise an inference of discrimination through evidence of differential treatment, a plaintiff must establish that she and the allegedly-comparable employee were disciplined for conduct of comparable seriousness. *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). For the reasons stated herein, the summary judgment evidence does not establish that Plaintiff and Gonzales engaged in conduct of comparable seriousness. Thus, any differential treatment that Plaintiff may have received is not indicative of discriminatory intent. Because Plaintiff relies solely upon evidence of differential treatment to state a prima facie case of discrimination under the *McDonnell Douglas* framework, and because the Court has held that Plaintiff's evidence of differential treatment is not sufficient to satisfy her burden, the Court grants APS's motion for summary judgment on Plaintiff's Title VII discrimination claim.

    C.    <u>Plaintiff has not Presented Evidence under a Mixed Motives Theory Sufficient to Withstand Summary Judgment</u>.

The Court is not persuaded to hold otherwise by Plaintiff's argument, in the alternative, that the evidence construed in her favor is sufficient to withstand summary judgment under a mixed-motives evidentiary framework. A plaintiff may rely upon a mixed-motive theory to prove intentional discrimination in violation of Title VII when both legitimate and illegitimate motives played a role in the adverse employment decision against her. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 & 247 n.12 (1989); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003).[4] In *Price Waterhouse v. Hopkins*, the Supreme Court held that when a discrimination case challenges an employment decision that may have been "the product of a mixture of legitimate and illegitimate motives, . . . it simply makes no sense to ask whether the legitimate

---

[4] The Civil Rights Act of 1991 superseded in part the mixed-motive analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B).

reason was *the* 'true reason.'" *Id.* at 247.  The Supreme Court therefore rejected the argument that "the plaintiff in a mixed-motives case must squeeze [his] proof into [*McDonnell Douglas'*] framework." *Id*. at 246-47.

Instead, the Supreme Court held, "When . . . an employer considers both gender and legitimate factors at the time of making a decision, that decision was 'because of' sex and the other, legitimate considerations—even if [a court] may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account." *Id.* at 241. However, "an employer shall not be liable if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person." *Id.* at 242. Thus, "once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role.   This balance of burdens is the direct result of Title VII's balance of rights." *Id.* at 244-45.

The Supreme Court has held that a plaintiff may pursue a Title VII discrimination claim in district court under both a *McDonnell Douglas* "pretext" framework and a mixed-motives framework.  *Id.* at 247 n.2.  "Discovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her," in which case the plaintiff would proceed under a mixed-motives evidentiary framework.  *Id.*  If, on the other hand, "the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following [the *McDonnell Douglas* framework], that the employer's stated reason for its decision is pretextual."  *Id.*

To satisfy her evidentiary burden of persuasion under a mixed-motives framework, a

plaintiff must "show[] that gender played a motivating part in an employment decision."   *Id.* at

244-45.   The burden of persuasion then shifts to the defendant to avoid a finding of liability "by

proving that it would have made the same decision even if it had not allowed gender to play such a

role."   *Id.*   Stated differently, the employer "must show that its legitimate reason, standing alone,

would have induced it to make the same decision."   *Id.* at 252.   Thus, under this framework, to

withstand summary judgment, Plaintiff must point to evidence that creates a factual dispute on the

question whether gender played a motiving part in APS's decision to terminate her.

Plaintiff's evidence does not satisfy this standard.   Rather, even if the Court construes all

the facts in Plaintiff's favor, the evidence does not establish that Plaintiff's gender was a

motivating factor in APS's decision to terminate her employment.   The Court already has held

that the evidence of Tolley's differential treatment of Gonzales is not sufficient to raise an

inference of discrimination based upon Plaintiff's sex.   For the same reasons that supported this

holding, the Court concludes that the evidence of differential treatment is not sufficient to establish

that Plaintiff's gender was a motivating factor in APS's decision to terminate Plaintiff.   Thus,

Plaintiff's evidence of differential treatment is not sufficient to withstand summary judgment

under a mixed-motives theory.

The Court likewise is not persuaded that Plaintiff's evidence that Tolley and APS continued

her employment for nearly three years, that Tolley and APS allowed her to attend twenty site visits

after the three complaints from the schools, or that Plaintiff led 50 site visits for APS and only

three of the visits resulted in a complaint against Plaintiff, is sufficient to create a factual dispute

whether gender played a motivating part in APS's decision to terminate Plaintiff.   This evidence

does not explain how Plaintiff's gender played a part—or how that part was motivating—in APS's

decision to terminate her.   Rather, Plaintiff herself argues that this evidence is probative of

whether APS had a legitimate basis to terminate her, whether Tolley and Brito-Asenap had "a true concern about Plaintiff's behavior and/or the complaints of the charter schools," and whether APS used the complaints as a pretext to terminate her.   [Doc. 55 at 19].   Plaintiff's evidence, thus, is not related to her burden of persuading the trier of fact that gender played a motivating part in APS's decision but instead is relevant to APS's burden of persuading the trier of fact that it would have made the same decision to terminate Plaintiff even if it had not allowed Plaintiff's gender to play a role.   Because Plaintiff has not identified evidence that raises a factual dispute sufficient to withstand summary judgment, and because the facts construed in Plaintiff's favor do not establish that Plaintiff's gender played a motivating part in APS's decision to terminate her, the Court holds that Plaintiff has failed to satisfy her summary judgment burden under a mixed-motives theory. Thus, the Court is not persuaded to deny APS's motion for summary judgment on Plaintiff's Title VII discrimination claim on the ground that Plaintiff has identified evidence sufficient to withstand summary judgment under a mixed-motives theory.

D.   <u>Plaintiff has not Identified Evidence that Satisfies her Summary Judgment Burden of Stating Prima Facie Case of Retaliation</u>.

In addition to prohibiting discrimination, Title VII contains an anti-retaliation provision that forbids an employer from penalizing an individual because she has "opposed any practice made an unlawful employment practice" by Title VII or because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII.   42 U.S.C. § 2000e-3(a).   A plaintiff bringing a retaliation claim under either the former "opposition clause" or the latter "participation clause" of Title VII must establish that retaliation played a part in a materially adverse employment action and may choose to satisfy this burden by direct or indirect evidence.   *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224-25

(10th Cir. 2008).   If a plaintiff does not present any direct evidence of retaliatory motive, as here, the burden-shifting analysis of *McDonnell Douglas* applies.   *See id.*

Plaintiff invokes the opposition clause of Title VII and contends that APS terminated her in retaliation for her complaints against Tolley and that APS treated her differently, harassed her, and subjected her to a hostile work environment in retaliation for her complaints.[5]   To establish a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."   *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009) (citations omitted).   "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."   *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1228 (10th Cir. 2006), *cert. denied*, 549 U.S. 1252 (2007).

APS contends that it is entitled to summary judgment on Plaintiff's Title VII retaliation claim because Plaintiff has not identified facts that establish the third element of her prima facie case—namely, that a causal connection existed between the protected activity and materially adverse action.   Plaintiff does not explain in her response to the motion for summary judgment why the facts before the Court give rise to a causal connection.   Indeed, other than a single sentence in which Plaintiff asserts that, "based on the testimony of Mr. Macaluso and Plaintiff herself regarding her treatment as opposed to that of . . . Mr. Gonzales, the facts give rise to an

---

[5]   APS argues that it is entitled to summary judgment on Plaintiff's retaliation claim to the extent she invokes the participation clause of Title VII because that clause protects only participation in proceeding initiated under Title VII.   Plaintiff does not contend that she is entitled to protection under the participation clause of Title VII.   Thus, the Court declines to consider APS's contention.

inference that discrimination occurred," Plaintiff's response contains no reference to the third element of her prima facie case of retaliation.[6]   [Doc. 55 at 24].   Plaintiff's response also fails to cite a single authority to support her contention that the facts give rise to an inference of retaliation.

The Court's rules require parties to cite authority in support of the positions they advance. *See* D.N.M.LR-Civ. 7.3(a).   Because Plaintiff's response violates this rule, the Court grants the motion for summary judgment on Plaintiff's retaliation claim on this ground.   The Court, however, also grants summary judgment on Plaintiff's retaliation claim on the additional independent ground that Plaintiff has failed to identify facts that demonstrate a causal connection between a protected activity and a subsequent adverse employment action.

Plaintiff's sole argument in support of her claim that she has pointed to facts which raise a material dispute on the question of a causal connection is that evidence of differential treatment gives rise to an inference of retaliation.   The Court already has rejected this argument in the context of granting summary judgment on Plaintiff's discrimination claim.   In analyzing APS's motion for summary judgment on the discrimination claim, the Court held that, to give rise to such an inference, the conduct must be comparable, and concluded that the evidence construed in Plaintiff's favor did not establish that Plaintiff and Gonzales engaged in conduct of comparable seriousness.   That Plaintiff's conduct was not comparable to Gonzales' conduct likewise defeats any argument that Tolley's differential treatment gives rise to an inference of retaliation.   Thus, Plaintiff cannot satisfy the third element of her prima facie case of retaliation by relying upon differential treatment.

---

[6]   Even the one sentence in Plaintiff's responsive memorandum, however, refers only to an inference that "discrimination" occurred.   The Court, however, construes the response in Plaintiff's favor, and therefore assumes that Plaintiff intended to state that the facts give rise to an inference that "retaliation" occurred.

In support of its motion for summary judgment on Plaintiff's Title VII retaliation claim, APS anticipates that Plaintiff might rely upon temporal proximity to raise an inference of harassment. The Tenth Circuit has held that a plaintiff may meet her prima facie burden of establishing a causal connection between a protected activity and a material adverse employment action through evidence establishing temporal proximity. *See Xia v. Salazar*, No. 12-4034, 2012 WL 5909096, *2 (10th Cir. Nov. 27, 2012); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). The Tenth Circuit has indicated that while "[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, . . . a three-month period, standing alone, is insufficient." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004).

APS placed Plaintiff on administrative leave on June 21, 2010, and terminated Plaintiff's employment on July 1, 2010. The only protected activity falling within three months of these adverse actions was her March 31, 2010, complaint to the OEO. The EEOC concluded that there was "reasonable cause to believe that the Respondent (Defendant APS) retaliated against Charging Party (Plaintiff Garcia) in violation of section 703(a) of Title VII," [Doc. 55-13], based upon the facts that Plaintiff filed a complaint with the OEO on March 31, 2010, that the OEO determined that Plaintiff's allegations of discrimination were "unsubstantiated" on June 18, 2010, that APS placed Plaintiff on administrative leave on June 21, 2010, and that APS terminated Plaintiff's employment on July 1, 2010, [*id.*]. The EEOC explained that, "[b]ased upon this analysis," reasonable causes exists to support a Title VII violation. [*Id.*]. The Court is not similarly persuaded.

The Tenth Circuit's decision in *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193 (10th Cir. 2005), is instructive and APS relies upon this case in support of its contention that Plaintiff's

pre-existing performance issues constitute an intervening cause precluding an inference of retaliation based upon temporal proximity. The Court agrees that, as in *Argo*, pre-existing performance problems negate any would-be inference of causation arising out of temporal proximity.

In *Argo*, the plaintiff argued that his termination was retaliatory because it occurred shortly after he filed an internal grievance. *See id.* at 1203. The Tenth Circuit rejected the argument because the employee, who had a history of disciplinary issues, failed to follow his employer's directives in the days between his grievance and his termination. *See id.* In particular, the Tenth Circuit noted that the plaintiff's misconduct "defeat[ed] any inference of retaliation because the company's concerns about tardiness and 'attitude' obviously predate[d] [the plaintiff's] internal complaint." *Id.*; *cf. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (suggesting that causation does not exist where an employer contemplated a particular action before the plaintiff's protected activity and "proceed[ed] along lines previously contemplated" after the protected activity); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) ("[e]vidence that the employer [was] concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity").

The evidence before the Court on summary judgment indicates that, just as the plaintiff in *Argo* had a history of disciplinary problems and failed to follow his employer's directives in the days between his grievance and termination, *see* 452 F.3d at 1203, Plaintiff also had a history of disciplinary issues and failed to follow her employer's directives in the weeks between her March 31, 2010, complaint and her July 1, 2010, termination. Thus, just as the *Argo* court concluded that the plaintiff's misconduct "defeat[ed] any inference of retaliation because the company's concerns about tardiness and 'attitude' obviously predate[d] [the plaintiff's] internal complaint," *id.*, so too

32

does this Court conclude that Plaintiff's performance problems preclude an inference of retaliation.   APS contemplated disciplinary action for Plaintiff's performance problems long before her March 31, 2010, complaint to the OEO, and thus Plaintiff's misconduct constitutes an intervening cause that breaks any causal connection based upon temporal proximity between Plaintiff's complaint and her suspension or termination.

More specifically, Defendant began disciplining Plaintiff in May 2008 for the same performance problems upon which it based her termination, and Plaintiff's performance problems continued through her suspension on June 21, 2010, and her termination on July 1, 2010.   Plaintiff received a coaching note in May 2008, instructing Plaintiff to act within her authority and to refrain from contacting outside administrators without approval.   Then, on September 12, 2008, Plaintiff received a formal corrective action memorandum to address her pattern of acting outside of her authority in violation of the coaching note.   In or around January 2009, Plaintiff received an e-mail from Tolley instructing her again not to contact outside administrators without prior approval.   Then, in May 2009, Plaintiff received a corrective action memorandum regarding the complaints Tolley had received from the charter school principals, Plaintiff's violation of the directive not to contact outside administrators without prior approval, and Plaintiff's adversarial tone in charter school reports.   Thereafter, Plaintiff received yet another corrective action memorandum reprimanding her for her punitive tone in her written reports.   Then, in September 2009, Plaintiff received a corrective action memorandum reprimanding her for failing to notify Tolley of meetings outside the office, in December 2009, she received a corrective action memorandum reprimanding her for failing to prepare adequate written reports, in March 2010, Plaintiff received a corrective action memorandum reprimanding her for communicating with and sending documents to outside administrators without seeking prior approval, and in June 2010,

Plaintiff received a corrective action memorandum reprimanding Plaintiff for conducting unassigned tasks without approval.   Of particular importance is this last written reprimand, which Plaintiff received on June 15, 2010, which was two and one-half months after she complained to the OEO about Tolley's behavior and only days before APS placed her on administrative leave and subsequently terminated her employment.

Causation does not exist where an employer contemplates a particular action before a plaintiff's protected activity and "proceed[s] along lines previously contemplated" after the protected activity.   *See Breeden*, 532 U.S. at 272.   Here, APS clearly contemplated—and indeed issued—progressive discipline for Plaintiff's persistent performance problems.   Plaintiff received at least one coaching note, one e-mail reminder, and seven corrective action memorandum addressing Plaintiff's persistent and recurring performance problems.   The ultimate progression of discipline naturally included termination, and the evidence specifically indicates that APS cited Plaintiff's repeated misconduct from 2008 to 2010, including Plaintiff's failure to comply with the scope of her job duties and her failure to seek approval when communicating with parties outside of the charter school office, as reasons for her termination.

Moreover, as in *Argo*, Plaintiff received additional discipline during the interim period between her protected activity and the subsequent adverse employment action.   On June 15, 2010, Plaintiff received a written reprimand for repeated misconduct, and this reprimand, as in *Argo*, was sufficient to break any causal connection between Plaintiff's March 31, 2010, complaint and her June 21, 2010, placement on administrative leave or between her March 2010 complaint and her July 1, 2010, termination.   *See* 452 F.3d at 1203.   Thus, the Court holds that Plaintiff's pre-existing persistent performance problems, which continued even after Plaintiff engaged in protected activity, preclude an inference of causation based solely upon the temporal proximity

between Plaintiff's OEO complaint and her termination.

APS also anticipates that Plaintiff might argue that Tolley's disciplinary memoranda—and not simply her suspension and subsequent termination—constituted adverse employment actions in retaliation for Plaintiff's protected activity, and that, because her termination was based upon these memoranda, she has established a causal connection between her termination and her protected activity. APS contends that any such argument is not viable because Plaintiff's pre-existing performance problems constitute a break in the chain of causation. The Court agrees.

Plaintiff generally argues that she engaged in protected activity by "complaining to her supervisors, beginning as early as November 6, 2008, about the perceived discrimination against her." The Court cannot determine whether any specific instance of protected activity unaccompanied by a date on which the activity occurred is linked causally by temporal proximity to an adverse employment action. Thus, the Court considers only whether dated activity—which the Court assumes for purposes of deciding the motion for summary judgment constitutes protected activity—is causally linked and concludes that Plaintiff's history of performance problems negates an inference of a causal connection.

The evidence before the Court establishes that Plaintiff's first complaint against Tolley occurred on July 16, 2009, when Plaintiff complained to APS's acting superintendent, chief of police, and director of the OEO that Tolley had entered a hallway and yelled, "Goddamn, mother fu**ing bitch." Thereafter, approximately eight weeks later, on September 9, 2009, Tolley issued a corrective action memorandum in which he reprimanded Plaintiff for failing to notify him of meetings outside the office. The Court holds that, consistent with *Argo*, Plaintiff's pre-existing performance problems negate any inference of a causal connection based upon temporal proximity. As early as May 12, 2008, well before Plaintiff first complaint about Tolley,

35

Brito-Asenap provided Plaintiff with a coaching note instructing Plaintiff to seek approval before attending meetings outside of the workplace and before contacting high-level APS employees and board members.   On September 12, 2008, Brito-Asenap determined that Plaintiff had failed to comply with the May 12, 2008, coaching note and served Plaintiff with a formal corrective action memorandum to address Plaintiff's pattern of acting outside of her authority in violation of the coaching note.   Likewise, in January 2009, well before Plaintiff first complained about Tolley, Tolley sent Plaintiff an e-mail reminding Plaintiff that she again had sent out a communication to an outside party before receiving approval to do so from Tolley in violation of Brito-Asenap's coaching note, and on May 21, 2009, also before Plaintiff complained about Tolley, Tolley served Plaintiff with a corrective action memorandum regarding her violation of Brito-Asenap's instruction that Plaintiff not contact outside administrators without prior approval.   This series of reprimands indicates that Tolley, as well as Plaintiff's prior supervisor Brito-Asenap, had reprimanded Plaintiff for conduct identical or similar to the conduct for which Tolley reprimanded Plaintiff in his September 9, 2009, memorandum, and that these disciplinary actions occurred prior to Plaintiff's July 2009 complaint regarding Tolley.   Thus, the Court concludes that Plaintiff's pre-existing performance problems negate any inference of causal connection from temporal proximity between Plaintiff's July 2009 complaint against Tolley and his September 2009 issuance of a written reprimand to Plaintiff.

Plaintiff complained again about Tolley's treatment of her on December 23, 2009. Approximately two and one-half months later, on March 10, 2010, Tolley issued a corrective action memorandum to Plaintiff to reprimand her for communicating with and sending documents to outside administrators without seeking prior approval.   Brito-Asenap's May 2008 coaching note and her September 2008 corrective action memorandum, as well as Tolley's January 2009

e-mail, May 2009 corrective action memorandum, and his September 2009 corrective action memorandum, addressed this same conduct. Thus, the Court holds that Plaintiff's history of performance problems and accompanying discipline, which long pre-dates Plaintiff's December 23, 2009, complaint, is sufficient to break any inference of a causal connection arising from temporal proximity between Plaintiff's December 2009 complaint and Tolley's March 2010 corrective action memorandum.

Plaintiff's third complaint against Tolley occurred in January 2010, when Plaintiff filed a complaint reporting Tolley's behavior with the United States Department of Education's Office of Civil Rights. Thereafter, on March 10, 2010, Tolley issued a corrective action memorandum to Plaintiff for communicating with and sending documents to outside administrators without seeking prior approval. Again, the Court concludes that Plaintiff's persistent performance problem of acting outside of the scope of her authority, and Tolley's and Brito-Asenap's history of issuing reprimands to Plaintiff prior to the onset of any complaint, negates an inference of a causal connection between Plaintiff's protected activity in January 2010 and Tolley's issuance of his March 10, 2010, corrective action memorandum.

Plaintiff has failed to identify evidence that establishes the third causation element of her prima facie case of retaliation. Plaintiff's evidence of differential treatment and temporal proximity is not sufficient to raise an inference of retaliatory motive. Thus, the Court grants summary judgment on Plaintiff's Title VII retaliation claim.

      E.    <u>Plaintiff has not Identified Evidence that Satisfies her Summary Judgment Burden of Demonstrating that APS's Stated Reason for its Adverse Actions was a Pretext for Discrimination or Retaliation</u>.

APS also is entitled to summary judgment on a second independent ground. Plaintiff's evidence is not sufficient to satisfy her ultimate evidentiary burden under *McDonnell Douglas* of

demonstrating that APS's proffered legitimate non-discriminatory reason to terminate Plaintiff's employment was a pretext for discrimination and harassment.   The question of pretext arises only in the third and final step of the *McDonnell Douglas* inquiry, after a plaintiff has successfully established a prima facie case of discrimination or retaliation and after an employer has articulated a legitimate, nondiscriminatory reason for the termination.[7]   *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (citation omitted).

Evidence of pretext may take a variety of forms, and "[a plaintiff] may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citation omitted).   There are, however, a few typical methods for a plaintiff to prove pretext. For example, evidence that similarly-situated employees received different treatment is also indicative of pretext and pertains to "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007) (internal quotation marks omitted); *see Kendrick*, 220 F.3d at 1230.   In addition, a plaintiff may prove pretext using evidence establishing the temporal proximity between a complaint about discrimination and a subsequent adverse employment action. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *Twigg*, 659 F.3d at 1001.   A plaintiff also may provide evidence that the defendant's stated reason for an adverse employment action was false to establish pretext.   *See Kendrick*, 220 F.3d at 1230.

The Court need not consider whether Plaintiff's evidence is sufficient to raise a dispute of

---

[7]   APS argues, and Plaintiff does not dispute, that it has articulated a legitimate, non-discriminatory reason for Plaintiff's discharge.   Because the Court agrees that APS has satisfied its burden under the *McDonnell Douglas* framework, the burden shifts back to Plaintiff to show that APS's proffered reason for her termination was pretextual.

fact precluding summary judgment on the question of pretext, because the Court's holding that Plaintiff has failed to present evidence of discrimination and retaliation sufficient to satisfy her initial prima facie burden under *McDonnell Douglas* is dispositive and the Court already has granted APS's motion for summary judgment on Plaintiff's discrimination and retaliation claims for this reason.   That Plaintiff presents no argument in her responsive memorandum on the question of pretext further suggests that the Court need not consider the question of pretext.

The response, however, does present some facts and argument in the context of arguing that Plaintiff has satisfied her prima facie burden.   For example, Plaintiff presents evidence that Tolley and APS allowed her to attend over twenty site visits after the school complaints.   In addition, Plaintiff's evidence of differential treatment as well as her evidence of temporal proximity is relevant to the question of pretext.   Thus, the Court will construe Plaintiff's response liberally as advancing a pretext argument.   The Court nonetheless holds that Plaintiff's evidence is not sufficient to satisfy her ultimate evidentiary burden under *McDonnell Douglas*, on summary judgment, of raising a dispute of fact on the question of pretext.

In the context of holding that Plaintiff has failed to point to evidence that establishes a prima facie case of discrimination or retaliation, the Court considered—but ultimately rejected—Plaintiff's contention that her evidence of continued site visits, differential treatment, and temporal proximity was sufficient to satisfy her prima facie burden.   The same reasons that supported the Court's decision in the context of Plaintiff's prima facie burden also support the Court's conclusion that Plaintiff's evidence does not generate a factual dispute sufficient to preclude summary judgment on the question of pretext.   Thus, the Court also grants summary judgment on Plaintiff's Title VII discrimination and retaliation claims on the independent ground that Plaintiff's evidence is not sufficient to establish that APS's proffered reason for her discharge

was a pretext for discrimination or retaliation.

III.    Defendant is Entitled to Summary Judgment on Plaintiff's Title VII Harassment Claim.

Title VII's prohibition of an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), also prohibits subjecting an employee to a hostile work environment.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2005).   To establish that a sexually hostile work environment exists, a plaintiff must prove "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [the discrimination was sufficiently severe or pervasive such that] the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."  *Dick*, 397 F.3d at 1262-63 (alteration in original); *accord Harsco*, 475 F.3d at 1186; *see also Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (citations omitted).   APS argues that Plaintiff's Title VII hostile work environment claim must fail because Plaintiff's facts do not establish the third and fourth elements of a hostile work environment claim.   The Court addresses APS's arguments in turn.

A.    Plaintiff has Failed to Establish Harassment Based Upon Sex.

To withstand APS's motion for summary judgment on her hostile work environment claim, Plaintiff must demonstrate that a factual dispute exists with respect to whether the harassing conduct at issue was based upon her sex.  *See Dick*, 97 F.3d at 1262-63.   To satisfy this burden, Plaintiff must "produce evidence" that she was "targeted for harassment because of her gender." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004).   General harassment if not

sexual is not actionable.  *See Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir. 1994), *cert. denied*, 516 U.S. 826 (1995); *see also Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."), *cert. denied*, 526 U.S. 1039 (1999).

The Supreme Court has recognized three evidentiary routes from which an inference of discrimination because of sex can be drawn in the hostile work environment context.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998); *Dick*, 397 F.3d at 1264.   "First, the [Supreme] Court held [in *Oncale v. Sundowner Offshore Services, Inc.*] that the inference is 'easy to draw' if the harasser and the harassed employee are of opposite sexes, at least when the conduct at issue involves 'explicit or implicit proposals of sexual activity,'" because "in that setting, 'it is reasonable to assume those proposals would not have been made to someone of the same sex.'"  *Id.* (quoting *Oncale*, 523 U.S. at 80).   The *Oncale* Court "was quick to point out, however, that 'harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.'"  *Id.* at 1263-64 (citing *Oncale*, 523 U.S. at 80).   "Hence, the inference of discrimination because of sex may be found a second way, such as when a woman harasses another woman 'in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."  *Id.* (citing *Oncale*, 523 U.S. at 80).   In addition, "[s]ex discrimination may be inferred yet a third way—when the plaintiff offers proof that the harasser treats men and women differently in the workplace."  *Id.* (citing *Oncale*, 523 U.S. at 80-81).

Plaintiff explicitly contends that she has presented evidence that satisfies the third evidentiary route—namely, that Tolley treated men and women differently in the workplace.

41

Plaintiff also indirectly suggests that her evidence satisfies the second evidentiary route—*i.e.*, that Tolley harassed Plaintiff in such a sex-specific and derogatory manner that "ma[de] it clear that [Tolley was] motivated by general hostility to the presence of women in the workplace." *Id.* The Court first considers whether the evidence is sufficient to raise an inference of harassment because of her sex via the second evidentiary route and thereafter considers whether Plaintiff's evidence raises an inference of harassment via the third evidentiary route.

1.   <u>Plaintiff's Evidence does not Satisfy *Oncale's* Second Evidentiary Route</u>.

Plaintiff contends that Tolley "used foul language at the workplace that was inappropriate and caused further hostility in the workplace including the use of the phrase 'goddamn mother fucking bitch.'"  [Doc. 55 at 21].  Plaintiff also maintains that "the continued memorandums created by Mr. Tolley concerning the purported bad conduct and unsatisfactory work were motivated by Mr. Tolley's desire to terminate Plaintiff as evidenced by the fact that, according to Mr. Macaluso, Mr. Tolley spent more time trying to get rid of Garcia than doing his own job." [*Id.* at 22].  In addition, Plaintiff maintains that Tolley treated Plaintiff less favorably than Gonzales and that this differential treatment gives rise to an inference of sex-based harassment. The Court concludes that this conduct does not establish that Tolley harassed Plaintiff in such a sex-specific and derogatory manner to make it clear that he was motivated by general hostility to the presence of women in the workplace.

Of the conduct identified by Plaintiff, only Tolley yelling "god damn mother fucking bitch" is sex-specific.  The Tenth Circuit has held that the word "bitch" is suggestive of harassment based upon gender.  *See Semsroth v. City of Wichita*, No. 07-3155, 2008 WL 5328466, *13 & n.18, *14 (10th Cir. Dec. 22, 2008) (holding that the plaintiff's "supervisors use[] and tolerat[ion] the use of the word 'bitch' further suggests that the harassment directed at [the

plaintiff] was based on her gender"); *see also Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999) ("[G]ender-based insults, including the term 'bitch,' may give rise to an inference of discrimination based on sex."); *EEOC v. PVNF*, 487 F.3d 790, 799 (10th Cir. 2007) (holding that when a supervisor "tolerate[s] the use of the word bitch to describe" a plaintiff, "a *jury* should decide whether these comments were made because of gender animus").

APS attempts to distinguish Tenth Circuit authority holding that the word "bitch" is indicative of harassment based upon gender.   APS contends that the Tenth Circuit's decisions are inapplicable because Plaintiff was not in Tolley's presence when he used the word (but rather was separated from Tolley by a closed door and a partition), because Plaintiff did not interact with Tolley before his outburst, and because Tolley apologized to Plaintiff and explained that his use of profanity was not related to her.   [Doc. 52 at 18-19].

The Court agrees that, on the facts before it, Tolley's utterance of the word "bitch" in conjunction with the other profanity, while separated from Plaintiff by a closed door and a partition, when Plaintiff was not involved in the conversation Tolley was having immediately prior to using profanity, is not sufficient to raise an inference that Tolley harassed Plaintiff in a sex-specific and derogatory manner.   Moreover, Plaintiff cannot rely upon the remaining gender-neutral conduct of Tolley's, including his differential treatment of Gonzales and his issuance of written reprimands to Plaintiff, to establish an inference of sex-based harassment.

Admittedly, gender-neutral conduct can support a harassment claim "if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex- and gender-related conduct occurred."   *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999); *see also Semsroth*, 2008 WL 5328466, at *14 (holding that "[e]ven if not all . . . incidents of alleged harassment can easily be categorized as overtly based on gender, some

certainly can be," such as the *Sesmroth* plaintiff's supervisor's use of the word "bitch," and "[i]n light of that, [a court] can consider it more likely that the other actions taken against [the plaintiff] that are not overtly gender-based may well stem from the same discriminatory hostility") (citations omitted).   "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus."   *Carter*, 173 F.3d at 701 (citations omitted); *accord O'Shea*, 185 F.3d at 1098.   To consider facially-neutral conduct, there must, however, be some indication that the neutral conduct was actually related to gender.   *See id.* at 1098.

In *O'Shea v. Yellow Technology Services, Inc.*, for example, the Tenth Circuit held that in light of the gender-based conduct of the plaintiff's co-workers, a reasonable jury could find that other facially neutral conduct—such as yelling at the plaintiff—was motivated by gender, *see id.* at 1098-99, 1101-02.   *O'Shea*, however, is distinguishable and therefore its holding does not govern here.

In *O'Shea*, the Tenth Circuit concluded that "the record fairly supports the inference that [an administrator's] numerous derogatory comments about women and his statements that Plaintiff was going to file a sexual harassment complaint against him," "along with [co-worker's] derogatory comments about women, caused or contributed to a hostile work environment which was based on Plaintiff's gender or sexual animus."   *Id.* at 1101.   The administrator's derogatory comments included (1) "making fun of his wife and making other derogatory comments about women such as that women talk too much and are less intelligent than men," (2) telling "others . . . that women in general were incompetent, stupid, and scatterbrained," (3) "tell[ing] some coworkers about a dream he had in which he was watching a woman jumping naked on a trampoline," (4) "describ[ing] to his coworkers how the woman's breasts looked," (5) saying that

44

"'Playboy is superior to a wife because at least with Playboy you get variety,'" and (6) telling "his co-workers that Plaintiff was going to file a sexual harassment lawsuit against him." *Id.* at 1098-99.   The co-workers, Plaintiff testified, "'made derogatory comments about women jokingly all the time.'"   *Id.* at 1099.   The *O'Shea* court held that this "obviously sex and gender-motivated conduct" "so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could view *all* of the allegedly harassing conduct occurring after [the administrator] began working for [the] Defendant[-employer] as the product of sex and gender hostility."   *Id.* at 1102.

Here, the only gender-specific conduct is Tolley's use of the word "bitch" on one occasion. The Tenth Circuit's holding in *O'Shea* does not suggest that Tolley's singular instance of gender-related conduct is sufficient to poison the totality of his conduct.   Thus, the Court declines to consider the gender-neutral conduct of Tolley as the product of gender or sex hostility.

### 2.   Plaintiff's Evidence does not Satisfy *Oncale's* Third Evidentiary Route.

The Supreme Court has held that "[s]ex discrimination may be inferred yet a third way—when the plaintiff offers proof that the harasser treats men and women differently in the workplace."   *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263-64 (10th Cir. 2005) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)).   For example, in *Chavez v. Thomas & Betts Corp.*, the Tenth Circuit held that "sufficient evidence exists to support the jury's finding that Plaintiff was harassed because of her sex," and explained that the "evidence supports the reasonable inference that [the supervisor] treated men and women differently under *Oncale's* third evidentiary route."   396 F.3d 1088, 1096 (10th Cir. 2005), *overruled on other grounds recognized in Metzler*, 464 F.3d at 1171 n.2.   In deciding whether differential treatment raises an inference of harassment because of a plaintiff's sex, the

"touchstone" of a district court's analysis should be to consider the evidence within its context under the totality of the circumstances.   *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).

In *Chavez*, the plaintiff and two of her co-workers testified that "[the plaintiff's supervisor] regularly directed sexually charged, humiliating, and hostile comments towards women but would not do the same towards men.   [One co-worker] testified that [the supervisor] was very hostile and 'bitter' towards women and regularly classified women as 'bitches,' but she was much more congenial towards men in the workplace."   *Id.* at 1096.   The plaintiff testified "that [the supervisor] . . . repeatedly humiliated [the plaintiff] in front of men in the workplace," "that [the supervisor] often made humiliating comments about [the plaintiff] in front of men regarding her 'body parts' and often called men over to guess what kind of underwear [the plaintiff] was wearing," "that [the supervisor] physically assaulted [the plaintiff] by pulling open her shirt [and] pants" in front of co-workers, and that "[the supervisor] did not engage in similar physically abusive conduct with men in the workplace."   *Id.* at 1096-97.   The Tenth Circuit held that, based upon this evidence, "a reasonable jury could conclude [that the supervisor] treated men and women differently in the workplace and that Plaintiff was harassed because of her sex."   *Id.* at 1097.

Likewise, in *Harsco Corporation v. Renner*, the Tenth Circuit, n affirming the district court's denial of the employer's motion for judgment as a matter of law,   held that the district court properly had found that the plaintiff submitted sufficient evidence to demonstrate that the discrimination was "'because of . . . [her] sex'" by proving that her harasser treated men and women differently in the workplace.   475 F.3d at 1186 (citing *Dick*, 397 F.3d at 1263-64).   The Tenth Circuit reasoned that "[t]he jury heard about several gender-based comments and actions

46

that only Ms. Renner was subjected to" and concluded that the employer-appellant "ha[d] not demonstrated that no reasonable inference from the facts presented could support Ms. Renner's claim."  *Id.* at 1187.

In *Harsco*, the evidence established that "at least one co-worker called Ms. Renner a "fat f**king c*nt," and two co-workers stood in the front and back of her car after work so she was unable to leave," that "Ms. Renner's co-workers spit tobacco on her car a few times per week at first, and then almost every day" for up to two months, that "[a] co-worker called Ms. Renner a "mother f**ker" and would bark, grin, and moan at her," that "[one co-worker] intimidated Ms. Renner by walking beside her while she walked to her car after work," and that "[another] co-worker blocked her from going to the bathroom," that a "co-worker stated that 'he could still do [Ms. Renner] if [she] just pulled down [her] pants,'" that "another co-worker told her that if Ms. Renner "got laid," then Ms. Renner would have a better attitude and said "that when [she] was bent over [she] was just in the right position for him.'"  *Id.* at 1184-85.  The evidence further established that Renner complained on at least eight occasions, including three complaints to the office manager, three complaints to the plaintiff's direct supervisor, a joint complaint to the office manager and the plaintiff's supervisor, and one complaint to the corporate human resources director.  *See id.*  Despite these complaints, the harassment continued.  *See id.*  The evidence also indicated that Renner's direct supervisor witnessed the harassment after Renner's complaints to the supervisor and that neither he nor any other person to whom the plaintiff complained took any action to investigate or prevent the harassment.  *See id.*

Plaintiff contends that, as in *Harsco Corporation v. Renner*, Tolley's differential treatment gives rise to an inference that Tolley harassed her because of her sex.  Plaintiff points to evidence that "Gonzales frequently c[a]me in late and le[ft] early," "Gonzales was never working," and

47

"Gonzales [was] working on personal matters at least half of the time when he was in the office," and that Tolley did not grant Plaintiff any similar leeway.   Plaintiff also maintains that "Tolley treated women differently based on their appearance which is patently unfair and discriminatory," that Tolley "used foul language at the workplace that was inappropriate and caused further hostility in the workplace including the use of the phrase 'goddamn mother fucking bitch,'" [*id.* at 21], and that Tolley, "motivated by [a] desire to terminate Plaintiff," issued "continu[ing] memorad[a] . . . concerning the purported bad conduct and unsatisfactory work," [*id.* at 22].

This evidence is not sufficient to raise an inference of sex-based harassment through *Oncale*'s third evidentiary route.   Plaintiff fails to identify a single case in which a court has held that a plaintiff has raised an inference of harassment based upon sex by pointing to evidence of differential treatment of one co-worker who is of the opposite sex from the plaintiff, differential discipline for misconduct when the plaintiff's misconduct is not of comparable seriousness to the co-worker's misconduct or when the plaintiff was disciplined for the same misconduct prior to the onset of the harassment, or differential treatment of one category of women from another category of women.

To the extent Plaintiff attempts to show that Tolley treated her differently from one male co-worker, Gonzales, to satisfy the third element of a hostile work environment claim, the Court concludes that this showing is insufficient as a matter of law to raise an inference of harassment because of sex.   While differential treatment of one plaintiff and one opposite-sex co-worker may be sufficient to raise an inference of discrimination and retaliation, provided the co-worker is similarly situated to the plaintiff in all relevant respects, *see supra* at II.B, Plaintiff has failed to identify any case holding that differential treatment of one plaintiff and one co-worker of the opposite sex is sufficient to raise an inference of harassment based upon sex.

Even if evidence of differential treatment of a single co-worker could, as a matter of law, raise an inference of harassment in the context of a hostile work environment claim, Plaintiff has not produced any authority, or indeed argument, establishing why the plaintiff and co-worker would not need to be similarly situated in all relevant respects to support the inference.   The Court already has explained, in the context of evaluating Plaintiff's discrimination and retaliation claims, that for differential treatment to be relevant, and, hence, for it to raise an inference of unlawful behavior, a plaintiff's misconduct must be of comparable seriousness to the co-worker's conduct. The Court held that Plaintiff and Gonzales did not engage in conduct of comparable seriousness. Thus, to the extent Plaintiff contends that Tolley's differential treatment of Gonzales gives rise to an inference of harassment, the Court rejects this argument for the same reason it rejected the argument in the context of Plaintiff's Title VII discrimination and retaliation claims.   The Court also holds that Tolley's differential treatment is not probative because, other than one instance of printing personal documents at work, the evidence does not indicate that Tolley either was aware of or was able to substantiate any allegation of misconduct on the part of Gonzales.   The Court further concludes that evidence that Plaintiff twice was disciplined by Brito-Asenap for similar misconduct prior to the onset of the alleged harassment undercuts any would-be inference of sex-based harassment.

Likewise, to the extent Plaintiff contends that the hostile harassing conduct that Tolley engaged in was to grant Gonzales exceptions to come to work late and leave early, to not work while at the office, or to work on personal matters while at the office, the Court is not persuaded that these "exceptions" for misconduct raise an inference of sex-based harassment.   Plaintiff has not established that she engaged in misconduct akin to Gonzales' and that Tolley failed to grant her exceptions for this misconduct.   There is no evidence, for example, that Plaintiff came in late to

the office or left early and that Tolley reprimanded her for this conduct, or that she did not work or worked on personal matters while at the office and that Tolley failed to grant Plaintiff leeway to not complete work while at the office.   To the contrary, Plaintiff herself contends that the evidence establishes that she was "always" in the office, that she was a "conscientious worker," and that she did not work on personal matters.   Thus, Plaintiff's evidence does not establish that she engaged in any comparable conduct for which Tolley treated her differently.

Finally, even if Tolley "treated women differently based on their appearance," the Court is not persuaded that this conduct raises an inference of sex-based harassment.   While this behavior may be "patently unfair and discriminatory," the behavior does not constitute discrimination based upon sex or another protected category and therefore the conduct is not actionable under Title VII. Treating one category of *women* differently from another category of *women* based upon their appearance constitutes differential treatment because of appearance and not differential treatment because of sex.

3.      Plaintiff has not Satisfied the Third Element of Her Prima Facie Case.

For the foregoing reasons, the Court concludes that Plaintiff has failed to raise an inference of harassment based upon her sex sufficient to sustain her summary judgment burden.   Plaintiff's evidence does not satisfy any of *Oncale's* evidentiary routes of raising an inference of sex-based harassment.   The evidence construed in Plaintiff's favor does not suggest that Tolley harassed Plaintiff with "explicit or implicit proposals of sexual activity," that Tolley harassed Plaintiff "in such sex-specific and derogatory terms . . . as to make it clear that [he was] motivated by general hostility to the presence of women in the workplace," or that Tolley treated men and women differently in the workplace.   *Oncale*, 523 U.S. at 80-81.   Accordingly, because Plaintiff has failed to satisfy an element of her prima facie case, the Court grants APS's motion for summary

judgment on Plaintiff's hostile work environment claim.

B.    Plaintiff has Failed to Establish Severe or Pervasive Harassment.

The Court also grants APS's motion for summary judgment on Plaintiff's Title VII hostile

work environment claim on the independent ground that Plaintiff has failed to point to evidence

establishing that Tolley's harassing behavior was sufficiently severe and/or pervasive to be

actionable under Title VII.   To establish severe or pervasive harassment, a plaintiff is required to

show more than the "'ordinary tribulations of the workplace.'"   *Faragher v. City of Boca Raton*,

524 U.S. 775, 788 (1998) ("[a] recurring point in [the Supreme Court's] opinions is that simple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment") (internal quotation marks and

citation omitted); *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) ("Title VII

does not establish 'a general civility code'" for the workplace, and "the run-of-the-mill boorish,

juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a

Title VII hostile work environment claim") (citations omitted).   To the contrary, "an employer

creates a hostile work environment only when 'the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'"   *Id.* at 664 (quoting *Hall

v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007)).

To satisfy this standard, "a plaintiff must show that the environment was both objectively

and subjectively hostile or abusive."   *Id.* (citations omitted).   The Court must assess "the

objective severity of the harassment from the perspective of a reasonable person in the plaintiff's

position."   *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).   In other words, the

Court must look to the "totality of the circumstances" and "consider[ ] such factors as the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Chavez v. N.M.*, 397 F.3d 826, 832-33 (10th Cir. 2005) (citation omitted).   Furthermore, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

In determining whether Tolley's conduct satisfies the severe and pervasive requirement, the Court considers the entire body of Tolley's conduct that Plaintiff identifies as harassing and not simply the conduct motivated by Plaintiff's gender.   *Cf. Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998) (holding that a district court may consider conduct not motivated by a plaintiff's gender when evaluating whether ambiguous conduct was gender motivated or whether gender-motivated conduct was sufficiently severe and persuasive to create Title VII liability); *accord O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1101-02 (10th Cir. 1999). Specifically, in addition to considering Tolley's gender-based conduct of uttering the phrase "mother f\*\*king bitch," the Court also considers Tolley's gender-neutral conduct of treating Gonzales more favorably than Plaintiff, treating women differently based on their appearance, and issuing multiple corrective action memoranda to Plaintiff.   The Court concludes that this conduct, even when considered under the totality of the circumstances and within the entire context of Plaintiff's work environment, is not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

The only gender-based conduct identified by Plaintiff is Tolley's utterance of a profane phrase, which included the word "bitch," within Plaintiff's earshot.   The Supreme Court has explained repeatedly that "offhand comments[] and isolated incidents (unless extremely serious)

52

will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted).   The Tenth Circuit also has held that "mere offensive utterances" do not rise to the level of Title VII violations.   *See Chavez*, 397 F.3d at 832.   Only an isolated instance of "extreme[] seriousness," such as sexual assault, is objectively threatening and therefore sufficient to establish a hostile work environment claim.   *See Morris*, 666 F.3d at 667 (citing cases).   In *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998), for example, the Tenth Circuit concluded that a work environment was sufficiently severe and abusive where a waitress-plaintiff was subjected to the "'filthy' comments" of two customers "such as 'I would like to get into your pants'" and had her hair pulled by one customer who also "grabbed her breast, and placed his mouth on it."   *Id.* at 1072.

The isolated use of profanity here is not sufficiently serious to implicate Title VII, particularly because Plaintiff was separated from Tolley by a closed door and a partition when he made the comment and because Plaintiff was not involved in the conversation Tolley was having immediately prior to his use of profanity.   Even if Tolley had directly called Plaintiff a "bitch," one instance of profanity is not sufficient to permeate a plaintiff's workplace with discriminatory intimidation, ridicule, and insult.   *Cf. Morris*, 666 F.3d at 664.   The Court's holding is buttressed by Tenth Circuit decisions holding that isolated conduct, more egregious than a single instance of profanity, does not implicate Title VII.   *Compare Lockard*, 162 F.3d at 1072 (one instance of sexual assault sufficient to implicate Title VII)[8] *with Morris*, 666 F.3d at 667-68 (allegations that

---

[8]   *See also Chavez*, 397 F.3d at 833-36 (evidence that the plaintiffs had been subjected to a "number of gender-based incidents" occurring over a long period of time, including sexual propositions, and "multiple incidents of hostile and physically threatening conduct," was sufficiently pervasive to support a hostile work environment claim); *Harsco Corp.*, 475 F.3d at 1184-85, 1188 ("an environment polluted with gender-specific comments and behavior that exceeded the mere flirtatiousness or baseness" was sufficiently pervasive to support a hostile work

the defendant uttered a few isolated slurs toward the plaintiff, even in conjunction with allegations that the defendant hit the plaintiff-nurse on the head twice within a two-week period and threw tissue from a patient's pericardium at the plaintiff in an operating room, were not sufficiently severe to create an abusive work environment) *and Kline v. Utah Anti-Discrim. & Labor Div.*, No. 10-4082, 2011 WL 1313781, *8 (10th Cir. Apr. 7, 2011) (two inappropriate sexual comments of manager made directly to plaintiff and manager's comments to others not directed at plaintiff containing sexual innuendo that plaintiff overheard are not sufficiently severe to create a hostile work environment); *Sprague v. Thorn Americas, Inc*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding that "five separate incidents of allegedly sexually-oriented, offensive comments either directed to [the plaintiff] or made in her presence in a sixteen month period" were not sufficiently pervasive to support a hostile work environment claim).  If in these cases five comments made directly to a plaintiff or in the plaintiff's presence were not sufficient to implicate Title VII and two comments made directly to a plaintiff with additional comments made to others were not sufficient, *see id.*; *Kline*, 2011 WL 1313781, at *8, surely one comment made outside of the presence of Plaintiff is not sufficient to generate liability under Title VII.

    That this one instance of gender-specific conduct does not amount to a Title VII hostile work environment does not end the Court's inquiry.  Rather, the Court must evaluate the entire body of Tolley's conduct and not simply the conduct motivated by Plaintiff's gender.  *Cf. Penry*, 155 F.3d at 1263.  Thus, the Court also considers whether Tolley's differential treatment of failing to grant Plaintiff favorable exceptions akin to those he gave Gonzales, Tolley's treatment of women differently based on their appearance, and Tolley's issuance of multiple corrective action memoranda to Plaintiff, in conjunction with Tolley's profane comment, is sufficient to implicate

environment claim).

Title VII.

The Court is not persuaded that this combined conduct is sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.   More specifically, Tolley's *favorable* treatment of Gonzales, and his failure to grant *favorable* treatment to Plaintiff, does not, as a matter of law, amount to a workplace "permeated with discriminatory intimidation, ridicule and insult."   *Cf. Morris*, 666 F.3d at 664.   Likewise, Tolley's treatment of attractive women more favorably than women he did not perceive to be attractive does not give rise to a work place "permeated with discriminatory intimidation, ridicule and insult."   *Id.*   The Tenth Circuit has confirmed repeatedly that Title VII does not establish a "general civility code" and therefore "run-of-the-mill" "annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim."   *Id.*   Thus, Tolley's failure to grant Plaintiff the privilege of coming late to work or leaving early, or of not completing work while at the office, and Tolley's treatment of attractive women differently from women he perceived to be unattractive, viewed in conjunction with his use of profanity on one occasion, does constitute actionable harassment under Title VII.

The Court's conclusion does not change when the Court views the differential treatment and use of profanity in conjunction with Tolley's issuance of multiple corrective action memoranda to Plaintiff.   Tolley's written reprimands, on the facts before the Court, do not constitute evidence of intimidation, ridicule, or insult to Plaintiff.   The memoranda themselves do not contain language that could be construed as intimidating, ridiculing, or insulting.   To the contrary, the memoranda address an ongoing and persistent performance problem of Plaintiff's.   Thus, Tolley's memoranda are not indicative of a severe or pervasive hostile work environment.

The Court's holding is buttressed by evidence that Tolley's corrective action memoranda

address performance problems of Plaintiff's pre-dating Tolley's alleged harassment.    Prior to the onset of Tolley's offending behavior, Brito-Asenap issued one coaching note and a formal corrective action memorandum to Plaintiff addressing the same performance issues for which Tolley issued his reprimands.    These pre-existing performance problems significantly undercut any argument that Tolley's memoranda constitute evidence of intimidation, ridicule, or insult to Plaintiff.

Drawing all reasonable inferences in favor of Plaintiff, the Court holds that a reasonable jury could not determine that Plaintiff experienced an objectively hostile work environment due to sexual discrimination.    *Cf. Morris*, 666 F.3d at 664.    The Court concludes that under the totality of the circumstances the incidents of gender-based and gender-neutral conduct were not sufficiently pervasive or severe to alter the terms and conditions of Plaintiff's employment or to create an abusive working environment.    *Cf. id.* at 669.    The Court therefore grants APS's motion for summary judgment on Plaintiff's Title VII hostile work environment claim.

IV.     <u>Defendant's Motion for Summary Judgment on Damages is Moot and Denied as Moot</u>.

Having granted APS's motion for summary judgment and dismissed all of Plaintiff's claims against APS, the Court holds that APS's motion for summary judgment on the question of damages is moot.   Accordingly, the Court denies the motion as moot.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court entered its March 31, 2014, order granting Albuquerque Public Schools, Inc.'s Motion for Summary Judgment [Doc. 52] and denying as moot APS's Motion for Summary Judgment on Damages [Doc. 53].

Dated this 26th day of March 2015.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

57
